GUTRIDE SAFIER LLP
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YURI FONS and JENNIFER TURNER, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GROCERY OUTLET INC.,<br><br>Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

- 1 -

CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 3

THE PARTIES .................................................................................................... 4

JURISDICTION AND VENUE ............................................................................. 5

TOLLING AND RELATED ARBITRATION PROCEEDINGS ............................ 5

SUBSTANTIVE ALLEGATIONS ....................................................................... 7

      A.   Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Based Tracking Technologies. ................... 7

      B.   Defendant Falsely Informed Users That They Could Reject the Website's Use of "All" Cookies. ............................................................ 15

      C.   The Private Communications Intercepted and Collected Through Third Party Cookies on Defendant's Website. ......................................... 21

            1.   The Website Causes the Interception of the Contents of Communications. ........................................................................ 21

            2.   Google Cookies ..................................................................... 23

            3.   Flipp Cookies ........................................................................ 30

      D.   The Private Communications Collected are Valuable. ...................... 31

PLAINTIFFS' EXPERIENCES ......................................................................... 32

CLASS ALLEGATIONS ................................................................................... 37

CAUSES OF ACTION ...................................................................................... 39

     First Cause of Action: Invasion of Privacy ........................................ 39

     Second Cause of Action: Intrusion Upon Seclusion ......................... 42

     Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ...................... 44

     Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) .............. 48

     Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation .......... 50

     Sixth Cause of Action: Unjust Enrichment ....................................... 52

PRAYER FOR RELIEF .................................................................................... 53

Plaintiffs Yuri Fons and Jennifer Turner and ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Grocery Outlet Inc. ("Defendant" or "Grocery Outlet"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

**INTRODUCTION**

1.      This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's website (www.groceryoutlet.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can choose to "Reject All" cookies, as shown in the following screenshot:



2.      Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3.      Even after users elect to "Reject All" cookies, Defendant surreptitiously causes several third parties—including Google LLC (DoubleClick and Google Analytics) and Flipp

CLASS ACTION COMPLAINT

Corp. (flipp.com and wishabi.com) (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and eavesdrop on users' private communications on the Website.

4.      Contrary to users' express rejection of cookies and tracking technologies, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5.      The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6.      This type of tracking and data sharing is exactly what Website visitors sought to avoid when they clicked or selected the "Reject All" button on the Website's popup cookie consent banner. Defendant falsely told Website users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7.      Plaintiff Yuri Fons is, and was at all relevant times, an individual and resident of San Jose, California. Plaintiff intends to remain in California and makes his permanent home there.

8.    Plaintiff Jennifer Turner is, and was at all relevant times, an individual and resident of Tulare, California. Plaintiff intends to remain in California and makes her permanent home there.

9.    Defendant Grocery Outlet Inc. is a California corporation with its headquarters and principal place of business in Emeryville, California.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

11.    The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12.    Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14.    Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## TOLLING AND RELATED ARBITRATION PROCEEDINGS

15.    The delayed discovery rule applies to Plaintiff Turner's claims. Plaintiff Turner was unaware that even though she rejected all cookies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to her browsers, stored on her devices, and transmitted to the Third Parties along with her private user data until she learned of Defendant's privacy violations from counsel. As alleged below, Plaintiff Turner does not have the expertise to test whether the Website honored users' requests to reject cookies.

16.     On or about June 13, 2024, Plaintiff Turner notified Defendant that she alleged that Defendant knowingly (and without consent) caused third-party cookies and corresponding data to be stored on consumers' devices and/or transmitted to third parties when they visit the Website despite consumers' clear rejection of such third-party cookies. Plaintiff Turner further notified Defendant that she intended to pursue her claims on behalf of herself and other similarly situated class members.

17.     The Website's Terms & Conditions ("T&C") contains an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendant before the American Arbitration Association ("AAA").

18.     On November 26, 2024, Plaintiff Turner filed a demand for arbitration in San Francisco with AAA against Defendant. *See* Ex. A. Plaintiff Turner sought a declaration in the arbitration that her claims arising from the same conduct alleged herein were not subject to arbitration.

19.     Arbitrator Dana Welch was assigned as the arbitrator.

20.     Following an initial conference on July 10, 2025, the Arbitrator entered a scheduling order that ordered briefing regarding arbitrability of the underlying dispute.

21.     On September 29, 2025, Arbitrator Welch issued an Order holding that Plaintiff Turner's claims were not subject to arbitration. Specifically, the Arbitrator found that Plaintiff Turner did not waive her objection to arbitration; the parties never formed an agreement to arbitrate; Defendant's T&C browsewrap agreement is unenforceable; and that Plaintiff Turner did not have actual or constructive knowledge of the T&C. *See* Ex. B.

22.     Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's fraudulent and unlawful conduct alleged herein due to its active concealment of material facts, which prevented Plaintiffs from discovering their claims sooner. Further, Plaintiffs' claims were equitably tolled by Plaintiff Turner's demand letter and her filing of the arbitration proceeding because Defendant had notice of the claims (and Plaintiff Turner's intent to pursue them in court as a putative class action). Defendant was not prejudiced in its ability to gather evidence for Plaintiffs' claims since their claims asserted in this Complaint are substantially similar to those

asserted in Plaintiff Turner's demand letter and arbitration proceeding. These extraordinary circumstances, including Defendant's intentional misrepresentations and Plaintiff Turner's pursuit of her claims in the arbitration proceeding, warrant tolling of the statute of limitations to allow Plaintiffs' to pursue their claims in this forum. Plaintiffs acted in good faith and engaged in reasonable conduct in filing the Complaint in this action.

## **SUBSTANTIVE ALLEGATIONS**

**A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Based Tracking Technologies.**

23.    Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

24.    An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

25.    As a result, Defendant knew or should have known that the devices used by Plaintiffs and Class members to access the Website were located in California.

26.    Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services

provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

27.    The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

28.    First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

29.    A third-party cookie is set by a third-party domain/webserver (e.g., www.google.com, p.flipp.com, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

30.    As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

CLASS ACTION COMPLAINT

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

31.     Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

32.     Defendant is an "extreme value retailer of quality, name-brand consumables and fresh products sold through a network of independently owned and operated stores."[1] Defendant also owns and operates the Website, which allows visitors to receive information about its products and locate nearby stores. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

33.     Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control

---

[1] *See* https://investors.groceryoutlet.com/ (last accessed 10/23/25).

1    over whether first-party and third-party cookies are placed on its California users' devices and/or

2    transmitted to third parties.

3        34.    Defendant explained the third-party cookies it used on the Website as follows in

4    its Privacy Policy:

> When you interact with the Services, certain information about your use of our Services is automatically collected. Much of this information is collected through cookies, web beacons, and other tracking technologies, as well as through your web browser or device. This includes:
>
> - Details of your visits to our site and information generated in the course of using our site (including the timing, frequency and pattern of service use) including, but not limited to, traffic data, location data, weblogs and other communication data, the resources that you access, and how you reached our site.
> - Details regarding the device you use to access our Services, including, but not limited to, your IP address, operating system, and browser type.
> - Information about how you interact with our ads and newsletters, including whether you open or click links in any correspondence.
> - Information that you make available to us on a social media platform (such as by clicking on a social media icon linked from our Services), including your account ID or username and other information included in your posts.
>
> …
>
> We partner with third parties who assist us in serving advertising regarding the Services to others who may be interested in the Services. We also partner with third parties who use cookies to display interest-based advertising to you on the Services. These third parties may use tracking technologies on our website to collect or receive information from the Services and elsewhere on the internet and use that information to provide measurement services and target ads. While Grocery Outlet will not share information that identifies you by name with unaffiliated third parties for their own uses, such third parties may, with sufficient data from other sources, be able to personally identify you.
>
> …
>
> Grocery Outlet relies on partners to provide many features for our sites and services using data about your use of Grocery outlet and other sites. We use cookies for the following purposes:
>
> - Site Operations: Enabling features that are necessary for providing you the services on our site, such as identifying you as being signed in tracking content views, remembering your preferences and the number of times you have been shown an advertisement.
> - Analytics: Allowing us to understand how our services are being used, track site performance, and make improvements.
> - Personalized Advertising: Delivering tailored advertising based on your preferences or interests across services and devices, and measuring the effectiveness of the ads.

- 11 -
CLASS ACTION COMPLAINT

- Social Media: Enabling the sharing of content from our services through social networking and other sites.[2]

35.    Defendant further explained the third-party cookies it used on the Website as follows in its Privacy Preference Center, which is accessible by clicking the "Cookie Settings" link in the Website's popup cookie consent banner:



---

[2] Grocery Outlet Inc. Privacy Policy (available at https://www.groceryoutlet.com/legal/privacy) (the "Privacy Policy").

CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT



✕

improve the performance of our site. They help us to know which pages are the most and least popular and see how visitors move around the site. All information these cookies collect is aggregated and therefore anonymous. If you do not allow these cookies we will not know when you have visited our site, and will not be able to monitor its performance.

— Functional Cookies  OFF

These cookies enable the website to provide enhanced functionality and personalisation. They may be set by us or by third party providers whose services we have added to our pages. If you do not allow these cookies then some or all of these services may not function properly.

+ Targeting Cookies  OFF

**Confirm My Choices**

Powered By CookiePro

CLASS ACTION COMPLAINT

**B.**     **Defendant Falsely Informed Users That They Could Reject the Website's Use of "All" Cookies.**

36.     When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated "By clicking 'Accept All Cookies', you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts." The banner then purported to provide users the opportunity, rather than choosing to "Accept All Cookies," to instead "Reject All" cookies by clicking or selecting the button to do so, as shown in the following screenshot from the Website:

1
2
3
4
5
6
7
8
9
10
11



12    37.    Users who clicked the "Cookie Settings" link were directed to the Website's

13 Privacy Preference Center. There Defendant represented that "When you visit any website, it

14 may store or retrieve information on your browser, mostly in the form of cookies. This

15 information might be about you, your preferences or your device and is mostly used to make the

16 site work as you expect it to. Because we respect your right to privacy, you can choose not to

17 allow some types of cookies. Click on the different category headings to find out more and

18 change our default settings." Defendant further represented that users could reject "Performance

19 Cookies," "Functional Cookies," and "Targeting Cookies.".

20    38.    Plaintiffs and other Website users who clicked or selected the "Reject All" button

21 in the popup cookie consent banner, thereby indicating their choice and/or agreement to decline

22 or reject all cookies and tracking technologies in use on the Website (or at least, all cookies used

23 to enhance site navigation, analyze site usage, and assist in Defendant's marketing efforts), could

24 then continue to browse the Website, as the popup cookie consent banner disappeared.

25    39.    Defendant's popup cookie consent banner led Plaintiffs, and all those Website

26 users similarly situated, to believe that they declined or rejected all cookies and tracking

27 technologies, especially those used to "enhance site navigation, analyze site usage, and assist in

28 [Defendant's] marketing efforts." The banner further reasonably led Plaintiffs and those Website

users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Reject All" button.

40.     Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users clicked or selected the "Reject All" button, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

41.     Nevertheless, even after receiving that notice, Defendant caused the Third Parties' cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

42.     In particular, when users clicked or selected the "Reject All" button, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

43.     Some aspects of the operations of the Third Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties even after the user clicked the "Reject All" cookies button on the Website's popup cookie consent banner.

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT

| | | | |
|---|---|---|---|
| | | | |

Elements  Console  Sources  **Network**  Performance  Me

☑ Preserve log    ☐ Disable cache  No throttling  ▼

Filter    ☐ Invert    ☐ Hide data URLs    ☐ Hide extension

☐ Big request rows

☐ Overview

| Name | Domain | Cook... ▼ |
|---|---|---|
| bframe?hl=en&v=9pvHvq7kSOTqqZusUzJ6e... | www.google.com | 3 |
| bframe?hl=en&v=9pvHvq7kSOTqqZusUzJ6e... | www.google.com | 3 |
| bframe?hl=en&v=9pvHvq7kSOTqqZusUzJ6e... | www.google.com | 3 |
| collect?v=2&tid=G-F956HL3RWS&_ng=1&gt... | analytics.google.com | 2 |
| collect?v=2&tid=G-F956HL3RWS&_ng=1&gt... | analytics.google.com | 2 |
| collect?v=2&tid=G-F956HL3RWS&_ng=1&gt... | analytics.google.com | 2 |
| ga-audiences?t=sr&aip=1&_r=4&slf_rd=1&v... | www.google.com | 2 |
| collect?t=dc&aip=1&_r=3&v=1&_v=j101&ti... | stats.g.doubleclick.net | 2 |
| collect?v=2&_ng=1&tid=G-F956HL3RWS&ci... | stats.g.doubleclick.net | 2 |
| collect?v=2&tid=G-F956HL3RWS&_ng=1&gt... | analytics.google.com | 2 |
| collect?v=2&tid=G-F956HL3RWS&_ng=1&gt... | analytics.google.com | 2 |
| ga-audiences?t=sr&aip=1&_r=4&slf_rd=1&v... | www.google.com | 2 |
| collect?t=dc&aip=1&_r=3&v=1&_v=j101&ti... | stats.g.doubleclick.net | 2 |
| rul?tid=G-F956HL3RWS&gacid=293086376.1... | td.doubleclick.net | 2 |
| beacons | p.flipp.com | 1 |
| beacons | p.flipp.com | 1 |
| collect?v=1&_v=j101&a=938563589&t=even... | www.google-analyti... | 1 |
| track.gif?SourceChannel=Hosted2&aid=flyer... | a.wishabi.com | 1 |
| beacons | p.flipp.com | 1 |
| collect?v=1&_v=j101&a=938563589&t=even... | www.google-analyti... | 1 |
| collect?v=1&_v=j101&a=938563589&t=pag... | www.google-analyti... | 1 |
| analytics.js | www.google-analyti... | 1 |
| _r?sdk=web2.85.0&_t=131717213767008022... | app.link | 1 |
| beacons | p.flipp.com | 1 |
| beacons | p.flipp.com | 1 |
| beacons | p.flipp.com | 1 |
| collect?v=1&_v=j101&a=979196128&t=even... | www.google-analyti... | 1 |
| beacons | p.flipp.com | 1 |
| collect?v=1&_v=j101&a=979196128&t=even... | www.google-analyti... | 1 |
| collect?v=1&_v=j101&a=979196128&t=pag... | www.google-analyti... | 1 |
| _r?sdk=web2.85.0&_t=131717213767008022... | app.link | 1 |
| _r?sdk=web2.85.0&_t=131717213767008022... | app.link | 1 |
| _r?sdk=web2.85.0&_t=131717213767008022... | app.link | 1 |
| data:application/x-... | | 0 |
| branch-latest.min.js | cdn.branch.io | 0 |
| gtm.js?id=GTM-P4BGDW | www.googletagman... | 0 |
| recaptcha__en.js | www.gstatic.com | 0 |

842 / 1096 requests    5.0 MB / 5.4 MB transferred    40.6 MB / 72.8 MB resources

CLASS ACTION COMPLAINT

44.    The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.groceryoutlet.com. The screenshots depict only network traffic occurring **after** the user rejected all cookies using the cookie banner. As shown above, despite the user's rejection of all cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.google.com, p.flipp.com and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all cookies and tracking technologies by clicking or selecting the "Reject All" button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all cookies.

45.    Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

46.    As users interact with the Website, even after clicking or selecting the "Reject All" button, thereby declining or rejecting the use of cookies and similar technologies for advertising and analytics, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data

can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

47.    The Third Party code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

## C.    **The Private Communications Intercepted and Collected Through Third Party Cookies on Defendant's Website.**

### 1.    **The Website Causes the Interception of the Contents of Communications.**

48.    The Website includes a search bar and other input fields that allow users to input information for the purpose of retrieving content from the Website. For example, below is a screenshot of a search bar on the Website where users can type into the search bar to cause the Website to return results responsive to the user's query.

CLASS ACTION COMPLAINT



49.    When a user inputs information into the search bar, the user intends to transmit the substantive contents of that search query directly to the Website for processing and response.

50.    Rather than limiting the transmission of those communications to the Website, Defendant programmed the Website so that the contents of users' search communications are automatically disclosed to and intercepted by the Third Parties while the communications are in transit between the user's browser and the Website.

51.    For example, the Website causes users' search strings to be transmitted to Flipp even after consumers have rejected all cookies. As illustrated below, the test search query "migraine medication" was transmitted to Flipp along with associated cookie data:



52.    The Website also offers a store-locator feature that allows users to enter location information, such as a zip code, to identify nearby retail locations. For example, when a user enters "94111" into the "Locate a Store" search field, the Website returns location-specific results:

CLASS ACTION COMPLAINT







53. On information and belief, the Website similarly causes the information entered by users into the store-locator feature—communications solely for transmission to the Website for purposes of obtaining store information—to be automatically intercepted by the Third Parties while in transit in the same manner as user search queries described above.

**2.    Google Cookies**

54. Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users "Reject All" cookies, to and from the **www.google.com**, **analytics.google.com**, **doubleclick.net**, and **www.google-analytics.com** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[3] Google serves targeted ads to web users across

---

[3] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

CLASS ACTION COMPLAINT

Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[4] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[5]

55.    Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[6] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

56.    Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[7] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a

---

[4] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.
[5] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).
[6] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).
[7] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

CLASS ACTION COMPLAINT

webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[8]

57.    Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[9]

58.    For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's domain, at analytics.google.com:

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

---

[8] Set up events (available at
https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).
[9] *See* About the Google Tag (available at
https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at
https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



| Key | Value |
| --- | --- |
| v | 2 |
| tid | G-F956HL3RWS |
| _ono | 1 |
| gtm | 45je43p0v9134458134za200 |
| _p | 1711416916362 |
| _gaz | 1 |
| gcd | 13l3l3l3l1 |
| npa | 0 |
| dma | 0 |
| cid | 28755121.1711416917 |
| ul | en-us |
| sr | 1440x900 |
| uaa | arm |
| uab | 64 |
| uafvl | Google%20Chrome;123.0.6312.58\|Not%3AA-Brand;8.0.0.0\|Chromium;123.0.6312.58 |
| uamb | 0 |
| uam | |
| uap | macOS |
| uapv | 13.5.1 |
| uaw | 0 |
| are | 1 |
| pae | 1 |
| pscdl | noapi |

CLASS ACTION COMPLAINT

| | |
|---|---|
| _eu | AAAI |
| _s | 1 |
| sid | 1711416916 |
| sct | 1 |
| seg | 0 |
| dl | https://www.groceryoutlet.com/circulars |
| dr | https://www.groceryoutlet.com/circulars |
| dt | Storefront Page |
| en | page_view |
| _fv | 1 |
| _nsi | 1 |
| _ss | 1 |
| tfd | 538 |

59.     The "cid" parameter above refers to "Client ID." It contains a unique identifier for the user's browser and device, that allows Google to link the user to their interactions with the website.[10]

60.     The "dl" parameter refers to "Document Location." It discloses to Google the URL that the user was visiting. Here, the url is https://www.groceryoutlet.com/circulars. The "dt" parameter refers to "Document Title." Here, the user was visiting a page with the title "Storefront Page."

61.     The parameters beginning in "ua…" tell Google extensive information about the user's device and browser, including the specific operating system, browser brand, and device processor.

62.     The "npa" parameter refers to "Non-Personalized Ads." When npa is set to 1, it indicates non-personalized ads preference is enabled. Here, npa is set to 0, indicating that standard (personalized) ads are enabled.

63.     Along with this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the following cookies to be sent to Google:

---

[10] *See, e.g.*, https://cheatography.com/dmpg-tom/cheat-sheets/google-universal-analytics-url-collect-parameters/; https://www.analyticsmarket.com/blog/how-google-analytics-collects-data/; https://www.owox.com/blog/use-cases/google-analytics-client-id/.

CLASS ACTION COMPLAINT

64.    The "__Secure-3PAPISID" and "__Secure-3PSID" cookies are utilized by Google to build a profile of Website visitor interests to show relevant and personalized ads through retargeting.

65.    The "NID" cookie is used for Google advertising. According to Google documentation, "[t]he 'NID' cookie is used to show Google ads in Google services for signed-out users," and "expires 6 months after a user's last use."[11]

---

[11] https://policies.google.com/technologies/cookies?hl=en-US.

CLASS ACTION COMPLAINT

66.     Further, along with all of this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google:

| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/123.0.0.0 Safari/537.36 |
| --- | --- |

67.     The "user-agent" corresponds to the device and browser that the user has used to access the Website.

68.     Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

69.     Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

70.     Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build

CLASS ACTION COMPLAINT

leads and sales by bringing previous visitors back to your website to complete what they started."[12]

71.    Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[13] Thus, Google has the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

### 3.    Flipp Cookies

72.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users "Reject All" cookies, to and from the **p.flipp.com** and **a.wishabi.com** domains. Each of these domains is associated with Flipp Corp. Flipp, formerly known as Wishabi, is a software company founded by former Microsoft engineers to assist retailers in transitioning print marketing to Flipp's online software platform.[14] Flipp assists its retail partners, such as Defendant, in creating, curating, and distributing "local promotion and savings content to millions of highly-engaged shoppers every day to drive superior returns on investment."[15] Such content includes coupons and advertisements that Flipp displays to users on popular websites based, among other things, on users' interests, shopping habits, and locations.[16]

---

[12] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).
[13] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).
[14] *See* https://www.insightpartners.com/portfolio/flipp-wishabi and https://www.equitynet.com/c/wishabi.
[15] *See* https://corp.flipp.com/about-us/.
[16] *See* https://corp.flipp.com/platforms/ and https://corp.flipp.com/platforms-retailers/.

CLASS ACTION COMPLAINT

To enable its advertising and analytics platform, Flipp utilizes cookies to collect data on user interactions with websites (including user browsing or shopping behavior and preferences) to perform advertising and analytics functions, i.e., to assist Flipp and its retail partners, including Defendant, in delivering advertisements tailored to user interests. Further, the cookies perform analytics functions to enable Flipp to measure and analyze the performance of its services and to ensure that ads are effective and relevant.

73.    These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

**D.    The Private Communications Collected are Valuable.**

74.    As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

75.    The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular grocery products and then target those users with advertisements for similar products both on the Website and across unrelated third-party websites.

76.    Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables

Defendant to assess trends across its brands and within the broader grocery market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

77.    The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[17] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

78.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

79.    By falsely representing consumers' ability to reject cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFFS' EXPERIENCES

### Plaintiff Fons

80.    Plaintiff Fons visited the Website, while located in California, on one or more occasions during the last four years to seek and obtain information about Grocery Outlet's products. During those visits, Plaintiff Fons selected links on the Website's homepage to view the "Weekly Ad" and, when prompted, entered his zip code into the "Store Locator" field to specify the store location he wished to view.

---

[17] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

81.   Plaintiff Fons' visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Fons is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

82.   When Plaintiff Fons visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to click or select the "Reject All" cookies button. Plaintiff Fons viewed Defendant's representation on the popup cookie consent banner that, "By clicking 'Accept All Cookies', you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts." Plaintiff Fons also viewed Defendant's additional representation that users, rather than choosing to "Accept All Cookies," could instead "Reject All" cookies.

83.   Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Fons selected and clicked the "Reject All" cookies button. Plaintiff Fons believed that clicking or selecting the "Reject All" cookies button on the popup cookie consent banner found on the Website would allow him to opt out of, decline, and/or reject "All" cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks and analytics services for the purposes of providing advertising (or marketing) and analytics).

84.   In selecting the "Reject All" cookies button, Plaintiff Fons gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Fons specifically rejected, based on Defendant's representations, those cookies used to "enhance site navigation, analyze site usage, and assist in [Defendant's] marketing efforts" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Fons continue browsing the Website.

85.   Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for advertising and analytics, to be placed on Plaintiff Fons' device and/or transmitted to the Third Parties along

with user data, without Plaintiff Fons' knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Fons that he could reject the use and/or placement of "All" cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Fons believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

86.     Then, as Plaintiff Fons continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Fons' clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing advertising and analytics from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Fons' Private Communications as Plaintiff Fons browsed the Website.

87.     Defendant's representations that consumers could "Reject All" cookies while Plaintiff Fons and users browsed the Website, or at least those involved in providing advertising and analytics, were untrue. Had Plaintiff Fons known this fact, he would not have used the Website. Moreover, Plaintiff Fons reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all cookies, Plaintiff Fons would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

88.     Plaintiff Fons continues to desire to browse content featured on the Website. Plaintiff Fons would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Fons would likely browse the Website again in the future, but will not do so until then. Plaintiff Fons regularly visits websites that feature content similar to that of the Website. Because Plaintiff Fons does not know how the Website is programmed, which can change over time, and because he does not have the technical

knowledge necessary to test whether the Website honors users' requests to reject all cookies and tracking technologies, Plaintiff Fons will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Fons is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Turner**

89.    Plaintiff Turner visited the Website to seek and obtain information about Grocery Outlet's products, while located in California, on one or more occasions during the last four years, including, in or around October 2023.

90.    Plaintiff Turner's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Turner is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

91.    When Plaintiff Turner visited the Website, it immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to click or select the "Reject All" cookies button. Plaintiff Turner viewed Defendant's representation on the popup cookie consent banner that, "By clicking 'Accept All Cookies', you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts." Plaintiff Turner also viewed Defendant's additional representation that users, rather than choosing to "Accept All Cookies," could instead "Reject All" cookies.

92.    Consistent with her typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Turner selected and clicked the "Reject All" cookies button. Plaintiff Turner believed that clicking or selecting the "Reject All"

cookies button on the popup cookie consent banner found on the Website would allow her to opt out of, decline, and/or reject "All" cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks and analytics services for the purposes of providing advertising (or marketing) and analytics).

93. In selecting the "Reject All" cookies button, Plaintiff Turner gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Turner specifically rejected, based on Defendant's representations, those cookies used to "enhance site navigation, analyze site usage, and assist in [Defendant's] marketing efforts" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Turner continue browsing the Website.

94. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for advertising and analytics, to be placed on Plaintiff Turner's device and/or transmitted to the Third Parties along with user data, without Plaintiff Turner's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Turner that she could reject the use and/or placement of "All" cookies and tracking technologies while she browsed the Website was false. Contrary to what Defendant made Plaintiff Turner believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

95. Then, as Plaintiff Turner continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Turner's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing advertising and analytics from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Turner's Private Communications as Plaintiff Turner browsed the Website.

96. Defendant's representations that consumers could "Reject All" cookies while Plaintiff Turner and users browsed the Website, or at least those involved in providing

advertising and analytics, were untrue. Had Plaintiff Turner known this fact, she would not have used the Website. Moreover, Plaintiff Turner reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all cookies, Plaintiff Turner would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

97.    Plaintiff Turner continues to desire to browse content featured on the Website. Plaintiff Turner would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Turner would likely browse the Website again in the future, but will not do so until then. Plaintiff Turner regularly visits websites that feature content similar to that of the Website. Because Plaintiff Turner does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all cookies and tracking technologies, Plaintiff Turner will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Turner is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

98.    Plaintiffs brings this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

**Class**: All persons who browsed the Website in the United States after clicking or selecting the "Reject All" button in the popup cookies consent banner or otherwise rejecting cookies in the Privacy Preference Center.

99.     This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

100.     **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

101.     **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject all cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

102.     The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.     Whether Defendant's actions violate California laws invoked herein; and

b.     Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

103.     **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, rejected cookies, and had their confidential Private Communications intercepted by the Third Parties.

104.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

105.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

106.    Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

107.    To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

108.    Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

109.    Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "Reject All" cookies and tracking technologies before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner on the Website, Plaintiffs and Class members rejected cookies and reasonably expected that their rejection of cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they rejected such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

110.    Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

1    111.    Defendant, in violation of Plaintiffs' and other Class members' reasonable
2    expectation of privacy and without their consent, permits the Third Parties to use cookies and
3    other tracking technologies to collect, track, and compile users' Private Communications,
4    including their browsing history, visit history, website interactions, user input data, demographic
5    information, interests and preferences, shopping behaviors, device information, referring URLs,
6    session information, user identifiers, and/or geolocation data—including whether a user is
7    located in California. The data that Defendant allowed third parties to collect enables the Third
8    Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed
9    information about a consumer's behavior, preferences, and demographics; create audience
10    segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and
11    perform targeted advertising and marketing analytics. Further, the Third Parties share user data
12    and/or the user profiles to unknown parties to further their financial gain. The consumer profiles
13    are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to
14    learn intimate details of their lives, and target them for advertising and other purposes, as
15    described herein, thereby harming them through the abrogation of their autonomy and their
16    ability to control dissemination and use of information about them.

17    112.    Defendant's actions constituted a serious invasion of privacy in that it invaded a
18    zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and
19    violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious
20    breach of social norms that is highly offensive.

21    113.    Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a
22    reasonable person.

23    114.    Defendant lacked a legitimate business interest in causing the placement and/or
24    transmission of third-party cookies along with user data that allowed the Third Parties to track,
25    intercept, receive, and collect Private Communications, including their browsing history, visit
26    history, website interactions, user input data, demographic information, interests and
27    preferences, shopping behaviors, device information, referring URLs, session information, user
28    identifiers, and/or geolocation data, without their consent.

115.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

116.    Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

117.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Second Cause of Action</u>: Intrusion Upon Seclusion**

118.    Plaintiffs reallege and incorporates by reference all paragraphs alleged herein.

119.    To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

120.    By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

121.    The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Website using third-party cookies that Defendant caused to be

stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to "Reject All" cookies.

122.    Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendant's promise that users could "Reject All" cookies, as well as state criminal and civil laws designed to protect individual privacy.

123.    Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could "Reject All" cookies when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they rejected all cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

124.    Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

125.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

126.    Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

1
2
3
4
5

127.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

6
7

**Third Cause of Action**: **Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

8

128.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

9

129.    California Penal Code § 631(a) provides, in pertinent part:

10
11
12
13
14
15

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

16
17
18
19

130.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

20
21

131.    Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

22
23
24

While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

25
26

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

27

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

28

132.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;
>
> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;
>
> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

133.    CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

134.    Defendant is a "person" within the meaning of California Penal Code § 631.

135.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

136.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties— constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do

not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

137.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

138.    Under § 631(a), Defendant must show it had the consent of all parties to a communication.

139.    At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

140.    At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

CLASS ACTION COMPLAINT

141.   The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

142.   At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

143.   Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to reject all cookies in the consent banner.

144.   The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located devices. In particular, the users' California-based devices, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

145.    Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

146.    Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

147.    Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant.  Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to food and groceries. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to reject all cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**<u>Fourth Cause of Action</u>: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

148.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

149.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

150.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

151.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

152.    The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

153.    At all relevant times, Defendant caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

154.    Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

155.    Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by clicking the "Reject All" button in the cookie consent banner.

156.    Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

157.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

158.    Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**<u>Fifth Cause of Action</u>: Common Law Fraud, Deceit and/or Misrepresentation**

159.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

160.    Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could "Reject All" cookies.

161.    However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked the "Reject All" cookies button in the popup cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to "Reject All" cookies.

162.    These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the

Website's programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to "Reject All" cookies, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

163.    Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

164.    Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

165.    Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

166.    Defendant's representation that consumers could reject cookies (including those used to "enhance site navigation, analyze site usage, and assist in [Defendant's] marketing efforts") if they clicked or selected the "Reject All" cookies button was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner prior to their interactions with the Website. Had Defendant disclosed that it caused third-party cookies to be

stored on Website visitors' devices that are related to advertising and analytics and/or share information with third parties even after they choose to reject all such cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

167.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject all cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

168.    Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

169.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

170.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## <u>Sixth Cause of Action</u>: Unjust Enrichment

171.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

172.    Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

173.    Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Reject All" cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including

their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected such cookies.

174.    Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

175.    Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

176.    Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

177.    It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

178.    There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

179.    Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

180.    Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

**PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendant as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.    An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.    An award of punitive damages;

D.    An award of nominal damages;

E.    An order for full restitution;

F.    An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.    An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.    For reasonable attorneys' fees and the costs of suit incurred; and

I.    For such further relief as may be just and proper.

Dated: January 30, 2026

GUTRIDE SAFIER LLP

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

# Exhibit A

1

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com

2

Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com

3

Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com

4

100 Pine Street, Suite 1250

5

San Francisco, CA 94111
Telephone: (415) 639-9090

6

Facsimile:  (415) 449-6469

7

*Attorneys for Claimant*

8

## AMERICAN ARBITRATION ASSOCIATION

9

## SAN FRANCISCO REGIONAL OFFICE

10

| | |
|---|---|
| JENNIFER TURNER, | Arbitration Case No. |
| Claimant, | **COMPLAINT AND DEMAND FOR ARBITRATION** |
| v. | |
| GROCERY OUTLET, INC., | |
| Respondent. | |

11

12

13

14

15

        Claimant Jennifer Turner ("Claimant") brings this action against Grocery Outlet, Inc.

16

("Respondent" or "Grocery Outlet"). Claimant's allegations against Grocery Outlet are based

17

upon information and belief and upon investigation of Claimant's counsel, except for allegations

18

specifically pertaining to Claimant, which are based upon Claimant's personal knowledge.

19

Claimant files this Complaint and Arbitration Demand without waiver of any right or argument,

20

specifically, and without limitation, that she did not assent to the Grocery Outlet website's Terms

21

& Conditions, including the arbitration agreement contained therein, and/or that the purported

22

arbitration agreement is unlawful and/or unenforceable.

23

## INTRODUCTION

24

        1.      This Complaint and Arbitration Demand concerns one issue: whether a valid and

25

enforceable arbitration agreement was formed between the parties to cover a separate dispute

26

about Respondent's internet cookie practices that is not part of this Complaint nor at issue in this

27

proceeding. For purposes of context, that underlying dispute relates to Claimant's visit to

28

Respondent's website (www.groceryoutlet.com, the "Website"), where, despite Claimant's agreement with Respondent that it would not place tracking cookies on her device, Respondent proceeded to do so anyway. As is relevant to the instant dispute, the Website also contains Terms & Conditions ("T&C" or "Terms") with an arbitration provision purporting to require any "dispute, controversy or claim" between website visitors and Respondent to be resolved by binding arbitration. Claimant contends that no agreement to arbitrate was ever formed. Respondent contends that the arbitration provision in the TOU is applicable to the underlying dispute and refused to consent to litigate the underlying dispute in federal court. Accordingly, she filed this arbitration demand to seek a declaration from the arbitrator that her underlying cookie dispute with Respondent is not subject to arbitration.

2.    The Website's T&C are available on the Website but are accessible only via an inconspicuous link displayed in small font at the bottom of the Website after all the main content. Moreover, Respondent does not require Website users to read or agree to the Terms before browsing the Website.

3.    When Claimant visited the Website, she did not see or otherwise assent to the T&C before choosing to "Reject All" cookies and browse the website. Accordingly, Claimant made no agreement to arbitrate her underlying cookie dispute.

## BACKGROUND ON THE UNDERLYING COOKIE DISPUTE

4.    This underlying dispute in this matter concerns an egregious privacy violation and total breach of consumer trust in blatant violation of California law. The Website is configured to use a multitude of cookies to enable third parties to track users' activity and communications on the Website.

5.    However, at least until placed on notice by Claimant,[1] the Website presented all visitors immediately with a popup cookies consent window stating that the Website uses cookies to "enhance site navigation, analyze site usage, and assist in [Respondent's]   marketing

---

[1] On or about June 13, 2024, Claimant notified Respondent of its ongoing invasions of privacy and alleged violations of law, as described herein, as required under California's Consumers Legal Remedies Act, Cal. Civil Code §§ 1750 *et seq*., and Consumer Privacy Rights Act, Cal. Bus. & Prof. Code §§ 1798, *et seq*.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

efforts[,]" with a button indicating that, instead of choosing to "Accept All Cookies," users can instead "Reject All" cookies, as shown in the following screenshot:



(Screenshot of the Grocery Outlet Website's popup cookies consent window.)

6.      Clicking the "Reject All" button indicates users' choice/agreement to reject **all cookies**. Thousands of visitors to the Website, including Claimant, did just that—they selected or clicked the "Reject All" button to indicate their choice/agreement to reject all cookies, inclusive of those that enable the sale and sharing of their personal data, and then proceeded to browse the Website.

7.      Unbeknownst to Claimant and other users, however, Respondent nonetheless caused cookies—both from Respondent and third parties with notorious privacy records, including Google/DoubleClick and Flipp.com—to be stored on the devices and browsers of Claimant and those similarly situated despite their rejection of all cookies. As a result, Respondent caused the sharing, and ultimately the sale, of broad swaths of personal data about Claimant, and similar users, to undisclosed third parties, contrary to Respondent's representations and Claimant's express directions. Claimant brings this arbitration solely to establish that the separate cookie dispute is not arbitrable.

COMPLAINT AND DEMAND FOR ARBITRATION

## PARTIES

8.    Claimant Jennifer Turner is, and was at all relevant times, an individual and resident of California. Claimant intends to remain in California and makes her permanent home there.

9.    Respondent Grocery Outlet, Inc. is a California corporation with its headquarters and principal place of business in Emeryville, California.

## SUBSTANTIVE ALLEGATIONS

### A.    Respondent's Unenforceable Browsewrap Agreement.

10.    Respondent's Website includes T&C that purport to govern the use of the Grocery Outlet Website. *See* T&C ("These Terms & Conditions ('Terms') apply to the Grocery Outlet Inc.® (GOBM) website ... BY ACCESSING OR OTHERWISE USING ANY GOBM WEBSITE, YOU AGREE TO THESE TERMS IN THEIR ENTIRETY."). These are located at the following web address: https://www.groceryoutlet.com/legal/terms-conditions.

11.    The Section of the T&C titled "Dispute Resolution" purports to require Website users to arbitrate all disputes with Respondent under the rules of the American Arbitration Association. *See* T&C ("[A]ny remaining dispute, controversy or claim (collectively, 'Dispute') relating in any way to these Terms or Grocery Outlet's services and/or products, including but not limited to the GOBM Website, or relating in any way to the communications between you and Grocery Outlet or any other user of the GOBM Website, will be finally resolved by binding arbitration. This mandatory arbitration agreement applies to you and to Grocery Outlet… Any controversy or claim arising out of or relating to these Terms, or the breach thereof, including all questions of arbitrability, shall be settled by arbitration administered by the American Arbitration Association ('AAA') in accordance with its Commercial Arbitration Rules by a sole arbitrator.")

12.    Further, the T&C, in calling for arbitration relating to "all questions of arbitrability" purport to grant exclusive authority to the arbitrator to determine issues of arbitrability, such as those raised in this Complaint and Demand for Arbitration.

13.     Claimant, however, did not assent to the T&C or the arbitration provision contained therein. An internet contract is valid only if the user takes some action to unambiguously manifest assent to the contract after the website has placed the user on actual notice of the terms of that contract or has put a reasonably prudent user on inquiry notice of those terms. Claimant never saw the T&C, or even the hyperlink to "Terms & Conditions," and thus had no actual notice that her continued browsing of the Website would be subject to an arbitration agreement.

14.     Nor did the Website place Claimant on inquiry notice of the T&C because it failed to provide reasonably conspicuous notice of the T&C. Moreover, Claimant took no action, such as clicking a button or checking a box, that unambiguously manifested her assent to the T&C. The Terms on the Website are no more than an unenforceable browsewrap agreement.

15.     When users visited the Website, Respondent immediately displayed to them a popup cookies window that prompted users to either "Accept All Cookies," "Reject All" cookies, or otherwise manage "Cookies Settings." The popup cookies window made no mention of the Website's T&C, contained no link to the T&C, and did not require the user to manifest assent to the Terms.



(Screenshot of Respondent's popup cookies window with no mention of the Website's Terms.)

16.     The only link to the T&C appeared in small font (identical to the surrounding font) at the bottom of the Website, as shown in the following screenshot:



(Screenshot showing the placement of the popup cookies window relative to the link to the Terms, labeled "Terms & Conditions," which is placed among many similar-looking links at the bottom of the page.)

17.     After making their selection in the popup cookies window, users could then continue to browse the Website, as the popup cookies window disappeared.

18.     The link to the T&C itself at the bottom of the Website is not conspicuous. It is not, for example, in a different color, font, or size from the surrounding text. Nor is it highlighted or emboldened relative to its surrounding text. Instead, it is very small and much less conspicuous than the images and text elsewhere on the Website. Moreover, it is not available on the Website when a user first visits; rather, they must scroll down to find it with no forewarning of being bound by the Terms.

19.     Respondent never required Claimant to manifest consent to the T&C. Respondent purports to bind users to the T&C simply by their continued use of the Website, which is legally insufficient even if the notice had been conspicuous.

**B.      Claimant's Experiences**

20.    During the last year, Claimant visited the Grocery Outlet Website to browse products.

21.    When Claimant visited the Grocery Outlet Website, the Website immediately presented her with Respondent's popup cookies window as it appeared at the time.

22.    Consistent with her typical practice in rejecting cookies and/or the sale of her personal data, Claimant selected and clicked the "Reject All" button, thereby giving Respondent notice that she did not consent to the use or placement of **all cookies**. In doing so, Claimant rejected third party cookies and those cookies that would enable the sale or sharing of her personal data. In reliance on these representations and promises, only then did Claimant continue browsing the Website.

23.    Claimant did not see the T&C link—or the actual Terms—on the Website prior to rejecting all cookies, or at any point thereafter.

## CAUSE OF ACTION

### Declaratory Judgment that the Underlying Dispute is Not Subject to Arbitration

24.    Claimant realleges and incorporates the paragraphs of this Complaint as if set forth herein.

25.    The Grocery Outlet Website's T&C purport to require arbitration of any and all disputes and to waive users' rights to bring a legal action, including a class action, in court, excepting certain intellectual property and small claims matters. In particular, the T&C state the following:

> **Agreement to Arbitrate**. After the informal dispute resolution process, any remaining dispute, controversy or claim (collectively, "Dispute") relating in any way to these Terms or Grocery Outlet's services and/or products, including but not limited to the GOBM Website, or relating in any way to the communications between you and Grocery Outlet or any other user of the GOBM Website, will be finally resolved by binding arbitration. This mandatory arbitration agreement applies to you and to Grocery Outlet. However, this arbitration agreement does not (a) govern any Dispute by Grocery Outlet for infringement of its intellectual property or access to the GOBM Website that is unauthorized or exceeds authorization granted in these Terms, or (b) bar you from making use of applicable small claims court procedures in appropriate cases.

…

**You agree that the U.S. Federal Arbitration Act governs the interpretation and enforcement of this provision, and that you and Grocery Outlet are each waiving the right to a trial by jury or to participate in a class action.**

…

**Arbitration Procedure and Rules**. Any controversy or claim arising out of or relating to these Terms, or the breach thereof, including all questions of arbitrability, shall be settled by arbitration administered by the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules by a sole arbitrator.

See the section of the T&C titled "Dispute Resolution" (available at https://www.groceryoutlet.com/legal/terms-conditions) (emphasis in original).

26.    Claimant did not view, and did not have actual notice of, Respondent's T&C, including the arbitration provision contained therein.

27.    The link to the T&C was inconspicuous and failed to provide reasonably prudent users such as Claimant with actual notice that her continued use of the Website would subject her to the T&C.

28.    Respondent did not require users such as Claimant to manifest their unambiguous assent to the T&C by clicking a button or checking a box.

29.    Claimant, therefore, had no notice, constructive or otherwise, of the T&C and never assented to them.

30.    Because Claimant did not assent to the Terms, Claimant is entitled to, and seeks, a declaration that the arbitration provision and class action waiver contained in the T&C are unenforceable and that the underlying dispute described herein is not subject to arbitration.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Claimant respectfully requests judgment against Respondent as follows:

(i)    An order declaring that Claimant did not assent to Respondent's T&C and that the underlying dispute described herein is not subject to arbitration;

(ii)    For reasonable attorneys' fees and the costs incurred; and

(iii)     For such further relief as may be just and proper.

Dated: November 26, 2024

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Claimant*

COMPLAINT AND DEMAND FOR ARBITRATION

# Exhibit B

AMERICAN ARBITRATION ASSOCIATION
CONSUMER ARBITRATION TRIBUNAL

JENNIFER TURNER,                          )
                                          )
            Claimant,                     )
                                          )          Case No. 01-24-0008-8863
                v.                        )
                                          )          ORDER RE ARBITRABILITY
GROCERY OUTLET, INC.                      )
                                          )
            Respondent.                   )
_____ )

I.  INTRODUCTION

Claimant Jennifer Turner ("Claimant") filed a Demand in this Tribunal seeking an order finding that her underlying dispute (the "Underlying Dispute") is not subject to arbitration.  Claimant argues  that Respondent Grocery Outlet, Inc.'s ("Respondent") arbitration agreement is unenforceable because she did not assent to it.  Seth Safier, Marie McCrary, Kali Backer, Andreas Moffett, and Ashley Garcia of Gutride Safier LLP represented Claimant.  Sara Frey, Sharon Daubert, and Timothy Branson of Gordon, Rees, Scully, Mansukhani, LLP represented Respondent.

The Underlying Dispute, which is not before this Tribunal, arises from Claimant's allegation that Respondent caused cookies to be stored on her device despite her choice to reject all cookies.  The sole issue before this Tribunal is whether or not the Underlying Dispute is arbitrable.

For the following reasons, this Tribunal finds that Respondent's arbitration agreement is unenforceable because Claimant did not assent to it,  Accordingly, the Underlying Dispute is not arbitrable.

## II.  JURISDICTION

This Tribunal's jurisdiction arises from Respondent's arbitration agreement, which

provides, *inter alia:*

> Any controversy or claim arising out of or relating to these Terms, or the
> breach thereof, including all questions of arbitrability, shall be settled by
> arbitration administered by the American Arbitration Association ("AAA")
> in accordance with its Commercial Rules[1] by a sole arbitrator. . . .

*Respondent's Terms & Conditions (the "T&C")* at p. 9.

The T&C also provides that California law applies to any disputes arising out of or

related to its terms, and that the Federal Arbitration Act ("FAA") "governs the

interpretation and enforcement" of the arbitration agreement.  *Id.*

## III.  STATEMENT OF FACTS

Claimant submitted a declaration under penalty of perjury stating that when she

visited Respondent's website (the "Website"), she was presented with a pop-up window

advising that it uses cookies to "enhance site navigation, analyze site usage, and assist in

[Respondent's] marketing efforts[,]" with a button indicating that, instead of choosing to

"Accept All Cookies," users could instead "Reject All" cookies.  Claimant declares that she

clicked the "Reject All Cookies" button, but notwithstanding that selection, Respondent

caused cookies - from both Respondent and third parties - to be stored on her device.

Respondent's arbitration agreement is contained in its T&C.  The only hyperlink to

the T&C appears at the bottom of the Website.  The hyperlink to the T&C is in the same

small, black, non-bolded font as other hyperlinks.  The T&C hyperlink is fifth down in a list

---

[1] The parties agreed at the July 10, 2025 preliminary hearing to use the AAA's Consumer Rules.

under the heading "Store Locator," under hyperlinks for "Contact Us," "FAQ," "Preference Center," and "Privacy."  To access the T&C containing the arbitration agreement, a Website visitor must click the T&C hyperlink.

Claimant declares that she did not "see or click any link leading to Respondent's Terms & Conditions . . . ."  She further declares that she "did not know that [her] use of the Website was subject to Respondent's Terms & Conditions, or that by doing so, [she] would agree to arbitrate any disputes with Respondent."

### IV.  THE PARTIES' CONTENTIONS

Claimant contends that she did consent to Respondent's arbitration agreement. She contends that the Website neither gave her actual, nor inquiry notice of the arbitration agreement, and thus, there is no agreement to arbitrate.  For these reasons, she contends that the arbitration agreement is unenforceable, and accordingly, the Underlying Claim is not arbitrable.

Respondent contends that Claimant waived her objection to arbitration by filing her Demand in this Tribunal.  It further contends that Claimant had reasonable inquiry notice of the T&C, and even if she did not see the arbitration agreement, her counsel did; because her counsel is her agent, she is bound by their actions.  Respondent further argues that the arbitration agreement encompasses the Underlying Dispute.  Finally, Respondent urges that, in the alternative, this Tribunal allow discovery to explore "the purported facts in her [Claimant's] declaration."

These contentions are addressed below.

V.   ANALYSIS

A.    <u>Claimant did not Waive Her Objection to Arbitrability</u>.

Waiver occurs only upon an "intentional relinquishment or abandonment of a known right."  *United States v. Olano*, 507 U.S. 725, 733 (1993).   Participating in an arbitration "to contest the arbitration itself" does "not waive [ ] objection[s] to the arbitration." *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 788 (9th Cir. 2001); *see also Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1280 (9th Cir. 2006) (en banc) (no waiver of right to object to arbitration where Claimant "forcefully objected to arbitrability at the outset of the dispute, never withdrew that objection, and did not proceed to arbitration on the merits of the [ ] claim.")

Claimant has never abandoned her objection to the arbitrability of the Underlying Dispute.  Indeed, her Demand only seeks a declaration that Respondent's arbitration agreement is unenforceable.  She does not bring a single claim relating to the alleged placement of cookies on her device (although that allegation is included in the background section of the Demand).  At the preliminary hearing, both parties agreed that arbitrability was the sole issue in front of the Tribunal.

Accordingly, Claimant has not waived her objection to the arbitrability of the Underlying Dispute.

B.    <u>The Parties Never Formed an Agreement to Arbitrate</u>.

As the party seeking to enforce the arbitration agreement, Respondent bears the burden of proving the existence of the agreement.  *Sifuentes v. Dropbox, Inc.*, No. 20-cv-

07908-HSG, 2022 U.S. Dist. LEXIS 125273, at *7 (N.D. Cal. June 29, 2022).  It has failed to meet that burden.

When evaluating whether an agreement has been formed, this Tribunal is obligated to apply "'general state-law principles of contract interpretation,' without a presumption in favor of arbitrability."  *Id.*  Respondent argues that the FAA favors arbitration agreements.  So does California.  But that is completely irrelevant to the issue of whether a contract has been formed.[2]  California law applies to that determination. *See Banner Entertainment, Inc. v. Superior Court*, 62 Cal. App. 4th 348, 357 (1998) ("California law is expressly incorporated into the allegedly enforceable contract in which the arbitration agreement in question appears, and therefore California law governs the adjudication of any disputes arising from that agreement.  California law incorporates many of the basic policy objectives contained in the FAA, including a presumption in favor of arbitrability."). Just as in *Banner Entertainment*, Respondent's arbitration agreement expressly incorporates California law.

Under applicable California law, parties must manifest their mutual assent to the terms of an agreement.  Cal. Civ. Code §1550 (mutual assent of the parties "is essential to the existence of the contract"); *see also Banner Entertainment,* 62 Cal. App. 4th at 357-358 ("California law is clear that there is no contract until there has been a meeting of the minds on all material points.").

---

[2] It is also irrelevant that the Underlying Dispute is within the scope of the arbitration agreement.  The threshold issue is whether an agreement has been formed.  Absent an agreement, the Underlying Dispute is not arbitrable.

The black letter principles underlying contract formation apply with no less force to the formation of contracts on a website.  *See Nguyen v. Barnes & Noble, Inc.,* 763 F.3d 1171, 1175 (9th Cir. 2014) ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.")

Applying these principles of contract formation, the Tribunal concludes that there has been no meeting of the minds, and therefore no agreement to arbitrate the Underlying Dispute.

    1.  *Respondent's T&C Browsewrap Agreement is Unenforceable.*

The parties agree that Respondent's T&C is a browsewrap agreement.   In browsewrap agreements, the "website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Id.* at 1175-6.   A browsewrap agreement does not require the user to click an "I agree" box after being presented with a list of terms and conditions of use, as is the case in clickwrap agreements.  *Id.* at 1176-77.

Courts have "routinely found clickwrap agreements enforceable." *Berman v. Freedom Fin. Network, LLC,* 30 F.4th 849, 856 (9th Cir. 2022).  The same cannot be said for browsewrap agreements.  *See Sellers v. JustAnswer LLC,* 73 Cal. App. 5th 444, 466 (2021).

Courts generally find browsewrap agreements unenforceable because, while the agreements operate under the theory that the "'user accepts a website's terms of use merely by browsing the site,'" there is no showing that the user took unambiguous action to agree to the terms of use.  *Id.* at 463 (citation omitted).

"'Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the

validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions.'" *Nguyen,* 763 F.3d 1176 (citations omitted).

Actual or constructive knowledge of the Website's T&C is absent here.

2. *Claimant did not have actual or constructive knowledge of the T&C.*

Claimant declares, under penalty of perjury, that she only clicked on the pop-up window to reject cookies, and never clicked on the T&C hyperlink.  Her declaration is sufficient evidence for this Tribunal to conclude that she did not have actual knowledge of the T&C containing the arbitration agreement.  *See Pemberton v. Rest. Brands Int'l, Inc. et al.,* 25-cv-03467-JSC at pp. 10-11 (N.D. Cal. Sept. 5, 2025).

Nor did Claimant have inquiry notice of the arbitration agreement.

Under California law, "an enforceable contract will be found based on inquiry notice theory only if:  (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."  *Berman,* 30 F.4th at 856.  For a conspicuous notice in this context, "a notice must be displayed in a font size and format such that a court can fairly assume that a reasonably prudent Internet user would have seen it. " *Id.*

Respondent's T&C hyperlink can in no way meet this threshold requirement.  The hyperlink appears at the bottom of the website.  It is fifth in a list of hyperlinks under the caption "Store locator."  It is in the same font and color as all the other links.  There is

nothing in that hyperlink that would draw a website user's eye to the hyperlink. Nor did Claimant take any action to manifest her assent to the arbitration agreement.

Courts applying California law have found browsewrap agreements unenforceable where the T&C hyperlinks were far more prominent than that of Respondent's. *See, e.g., Nguyen,* 763 F.3d at 1179 ("where a website makes its terms of use available *via a conspicuous hyperlink on every page* of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on - without more - is insufficient to give rise to constructive notice") (emphasis added).

Respondent argues that even if Claimant did not have actual or constructive notice of the T&C, her attorney did, and because her attorney is her agent, she is bound by his actual knowledge. The Tribunal rejects this argument. Counsel's subsequent discovery of the arbitration agreement in the T&C cannot retroactively bind Claimant to its terms. To find otherwise would mean that every case filed disputing the enforceability of a browsewrap agreement would fail, because it is undoubtedly true that an attorney checks for the arbitration agreement before filing a challenge to its enforceability. It is notable that Respondent cites no decision supporting this contention.

　　　　　　　　3. *The Tribunal declines to grant discovery.*

Respondent seeks to take a short deposition of Claimant "to explore the purported facts in her declaration." The Tribunal declines to grant this request.

Claimant's declaration states facts, not legal conclusions. Only when a declaration offers "conclusions and not facts" may a tribunal "disregard a self-serving declaration" to

grant additional discovery. *See Ironhawk Tech., Inc. v. Dropbox, Inc.,* 2 F.4th 1150, 1166

(9th Cir. 2021).

VI.  CONCLUSION

For the foregoing reasons, Respondent's arbitration agreement is unenforceable.

Because the Underlying Dispute is not arbitrable, the Tribunal lacks jurisdiction over it.

IT IS SO ORDERED.                                    September 29, 2025

Dana Welch
Arbitrator